IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JONATHAN FLY, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. SAG-20-3310 |
| CORIZON HEALTH, et al. | * | |
| Defendants. | * | |
| | *** | |

# MEMORANDUM OPINION

Plaintiff Jonathan Fly, a self-represented prisoner confined at Western Correctional Institution ("WCI"), filed this civil rights action alleging he is receiving inadequate treatment for serious medical issues related to Crohn's disease. ECF No. 1. Fly also filed an Amended Complaint, which is the operative pleading. ECF No. 5-3. At this time, the action remains pending against Corizon Health, and Dr. Asresahegn Getachew, a physician employed by Corizon Health.

Defendants Corizon Health and Dr. Getachew filed a Motion to Dismiss or, Alternatively, for Summary Judgment. ECF No. 26. Fly has responded to the Motion, ECF No. 30, and Defendants filed a Reply. ECF No. 33. Corizon Health has since filed bankruptcy proceedings in which an automatic stay has been issued as to claims brought against it. ECF Nos. 34, 35. Resolution of the pending motion as it pertains to Corizon Health is therefore deferred.

The Court finds that a hearing is not necessary. *See* Local Rule 105.6 (D. Md. 2021). For the reasons discussed below, Defendants' motion, construed in part as a Motion to Dismiss, and in part as a Motion for Summary Judgment, will be denied as to Dr. Asresahegn Getachew.

**Background**

In his Amended Complaint, dated December 26, 2020, Fly raises medical complaints pertaining to the lack of treatment for diagnosed Crohn's disease. ECF No. 5-3. He specifically complains that his ostomy bags are leaking, and he is not receiving wound care for his fistulas, or Entyvio infusions. *Id.*

Fly states that he received Entyvio when he was "incarcerated at [T]owson" from May 9, 2019 through October 14, 2019, prior to his transfer to WCI. ECF No. 5-3 at 5. When he arrived at WCI in October 2019, he met with a nurse and advised her that he had Crohn's disease, an ostomy bag,[1] and anal fistulas. *Id.* at 4. He also advised the nurse that he had paperwork from Greater Baltimore Medical Center ("GBMC") documenting that he receives Entyvio for his Crohn's disease, as well as supplies and medications for wound care. *Id.* at 4.

In November 2019, Fly met with Dr. Cocarr at WCI, and provided the paperwork from GBMC. *Id.* He advised the doctor that he was having chronic abdominal pains. *Id.* Fly was told that because he already had doctors "at home," he would continue to see them. *Id.* Several months passed, and Fly did not receive needed treatment. *Id.* at 5. He contacted the medical department, the warden, and others for assistance in obtaining Entyvio and wound care for his fistulas. *Id.* at 5-7.

---

[1] Surgeons perform ileostomies when the colon or rectum cannot be used to eliminate digestive waste. *See* https://my.clevelandclinic.org/health/treatments/21726-ileostomy (last checked February 24, 2023). Permanent ileostomies use external or internal pouches called ileal pouches to collect and store digestive waste. *See* https://my.clevelandclinic.org/health/treatments/21726-ileostomy (last checked February 24, 2023).

In July 2020, approximately nine months after he arrived at WCI, Fly had a telemedicine visit with Dr. Cocarr who told him the Entyvio was too costly and Remicade is an alternative medicine. *Id.* at 6. Fly told Dr. Cocarr that Remicade was not a successful treatment for him based on his trial of that medication in 2012. *Id.* Dr. Cocarr said that he could then get the Entyvio at the University of Maryland Medical Center ("UMMS"), but he would first need to have an endoscopy. *Id.* Fly states that he was sent for an endoscopy at Bon Secours Hospital, and was returned without having had the procedure because there was no authorization from WCI for it to be done. *Id.*

Another month and a half passed, and Fly was seen by another physician who told him they wanted to try the Remicade instead of Entyvio. *Id.* Fly again expressed that Remicade does not work for him, and provided the names of his gastroenterologist, surgeon, and primary care doctor. *Id.* at 7.

Another month passed, and Fly reported that his ostomy bags were leaking. At a medical visit, he asked again for assistance with medication and care for his fistulas. *Id.* Fly was told that the medical department would take care of the "bag" issue now, and he should write a sick call slip for the additional treatment. *Id.* He returned to his cell and submitted a sick call slip stating that his fistulas "hurt" and "smell bad." *Id.* He was then examined by a nurse, who confirmed there was an issue with his fistulas and said he would be seen by the "provider." *Id.* Two additional months passed and Fly was not seen by a provider, nor did he receive wound care for the fistulas. *Id.* Fly was still not receiving any medication to treat his Crohn's disease or wound care for his fistulas when his Amended Complaint was prepared on December 26, 2020. *Id.* at 8. By this time, he had been housed at WCI for over 14 months. *Id.* at 8.

Given the seriousness of the allegations raised, counsel for the Maryland Department of Public Safety and Correctional Services ("DPSCS") was directed to provide a preliminary response explaining what has been done to ensure that Fly is receiving appropriate medical care. ECF No. 7. On Jun 1, 2021, counsel filed a response and included a copy of Fly's medical records, certified on May 11, 2021. ECF Nos. 8, 8-2, 8-3.

On December 3, 2021, the Court issued a Memorandum Opinion that included its summary of the medical records provided by DPSCS, as follows:

> The records generally document that Fly is to be provided with a two-week supply of colostomy bags. Additional bags are not provided because Fly "was found to be carrying a home[-]made shank (KNIFE) in his colostomy bag…". ECF No. 8-2 at 92. The weapon was "causing holes and damaging them." *Id.* at 90. Medical records further state that "this puts staff and fellow inmate[s] at significant risk of injury." *Id.* at 92.
>
> The medical records do not indicate that Fly has ever received medication at WCI for Crohn's disease and the preliminary response does not include a declaration by a medical provider addressing this issue. Instead, the records document that Fly received Entyvio from 2016 through 2019 and also that an alternative medication, Remicade, was not successful to treat his illness. ECF No. 8-1 at 80, 85.
>
> The medical records document that while housed at WCI, Fly was seen by a consulting gastroenterologist who continually made requests for Fly to receive Entyvio infusions at 8 week intervals. *See* 8-1 at 8 (11/26/19 note referencing GI consult of 10/23/19 recommending Entyvio infusions "be continued"); *id.* at 16 (4/13/20 chronic care note referencing need for Entyvio infusions); *id.* at 23 (5/26/20 consultation referencing pre-incarceration Entyvio infusions, request to restart infusions, and notes Fly not currently on medications); *id.* at 25 (5/26/20 sick call referencing prior Entyvio infusions, and GI consult of 11/15/19 agreeing to continued need); *id.* at 27 (6/17/20 note documenting gastroenterologist consult recommending Entyvio infusion be scheduled and noting it was originally approved on 12/3/19); *id.* at 30 (6/23/20 chronic care note referencing need to continue infusions); *id.* at 31 (7/1/20 request "asap" for Entyvio infusion approved on 12/3/19 per 6/17/20 gastroenterologist consultation); *id.* at 35 (7/7/20 consultation noting infusion needed "asap"); *id.* at 37 (7/7/20 chart update noting "cost concerns" with Entyvio infusions and need to speak with patient regarding changing infusion to Remicade); *id.* at 41 (7/8/20 chronic care note that Fly "will be switched to Remicade"); *id.* at 42 (7/8/20 consult note that Entyvio is unavailable at GMC due to cost of drug and recommendation that Fly receive a consult at UMMS for an Entyvio infusion); *id.* at 68 (10/30/20 chart note that response from

> University of Maryland Hospital Center for a consult is outstanding pertaining to Entyvio). Medical records dated after October 30, 2020 do not reference that Fly is receiving Entyvio infusions, Remicade, or that medication remains an unresolved issue. Fly has also not provided further information to the Court since filing his amended complaint.

ECF No. 9 at 1-3.

The Court directed service of the Amended Complaint, and also directed that, with its reply, Corizon Health address if there is an official policy or custom pertaining to the dispensing of Entyvio to treat Crohn's disease and if so, to provide the policy. ECF Nos. 9, 10. In addition, the Court ordered that the WCI Medical Director Dr. Asresahegn Getachew, who holds a supervisory position, be added as a Defendant. Both Corizon Health and Dr. Getachew were directed to provide information about whether Fly is presently receiving Entyvio and, if so, the date treatment with Entyvio began. Further, Corizon Health and Dr. Getachew were directed, if Fly is not presently receiving Entyvio, to state the reason why the medication is not being provided, and what, if any, other treatment Fly is receiving for his Crohn's disease.

With their instant Motion, Defendants provide medical records and the Declaration of Defendant Dr. Getachew. ECF Nos. 26, 26-2, 26-3. The medical records total 819 pages, contain numerous blank or partially blank but numbered pages (*see, e.g.*, ECF No. 26-2 at 151, 154, 156-158, 162, 164, 167-172, 175, 177-181, 183-185, 187-195), and the back half of the records appear to contain multiple duplicated pages from the front half of the records (*see, e.g.*, the medication records, *id.* at 378 to 410, and 787 to 819). The records are also not current, as of the date of filing, as discussed below in relation to Dr. Getachew's Declaration.

In the Declaration, dated May 12, 2022, Dr. Getachew attests that he sees patients as needed through telemedicine, has previously seen Fly in telemedicine, and is "familiar" with his care. ECF No. 26-3 at 2. He states Fly has received "appropriate" treatment for his Crohn's disease

5

since arriving at WCI on October 14, 2019. *Id.* at 3.  Dr. Getachew reiterates the medical summary from the Court's prior Memorandum and adds information regarding medical events that took place after the DPSCS filed its response on June 1, 2021. *Id.* at 3-4.  He states that on July 12, 2021, Fly was seen by Dr. Caleb Blaine Hudspath for "resuming Entyvio versus starting Remicade" and on that date Fly received an endoscopy.  ECF No. 26-3 at 4, citing medical records ECF 26-2 at 69.  This appointment took place 21 months after Fly's arrival at WCI in October, 2019.

Three months later, on October 13, 2021, Fly was seen on a referral to Dr. Eric Goldberg/Dr. Ahmed Chatila of UMMS Gastroenterology/Hepatology clinic for follow up for his Crohn's disease.  ECF 26-3 at 5, citing medical records ECF 26-2 at 372.  The UMMS record indicates that Fly had last been seen by Dr. Cross at UMMS one year prior, in October 2020, for restaging of Crohn's disease prior to restarting Entyvio.  *Id.*  At the October 2020 visit, Dr. Cross had recommended Fly be restarted on Entyvio because his Crohn's had progressed on Remicade. *Id.*  At the October 13, 2021 appointment, Dr. Chatila recommended that Fly restart Entyvio at 300 mg infusion at 0, 2, and 6 weeks, and then every 8 weeks thereafter.  *Id.* at 374. Noted was Fly's ongoing abdominal and joint pain, and confirmation of active Crohn's disease, as well as a fistula. *Id.*

Based on knowledge obtained from the "schedulers" at WCI, Dr. Getachew states that the "medical panel" advised the schedulers that Fly refused to go out for his first Entyvio infusion on November 9, 2021.  ECF No. 26-3 at 5.  On November 30, 2021, WCI called UMMS to reschedule the infusion, and on January 28, 2022, Fly had his first infusion.  *Id.*  Dates of February 11, 2022 and March 11, 2022 were then scheduled for subsequent infusions.  *Id.*  On February 11, 2022, officers reported that Fly refused to go out for treatment, and then due to missing that appointment,

6

and the need to provide infusions one month apart, UMMS cancelled the March 11, 2022 infusion. *Id.* On March 17, 2022, "Nicole" from UMMS contacted the WCI schedulers and stated that Fly will need to restart treatment because of inconsistency with infusions, and he will require a new consult order. *Id.* at 6. In addition, it was reported that the UMMS GI wanted to see Fly prior to restarting infusions, to reiterate the importance of consistency. *Id.* On April 13, 2022, Fly was seen by the UMMS GI and infusions were scheduled for April 25, 2022, May 9, 2022, and June 10, 2022. *Id.* Fly was also scheduled to see the UMMS provider on June 10, 2022. *Id.* Fly was seen next on April 25, 2022 and received an infusion. *Id.* Dr. Getachew does not cite to any medical records documenting the information he obtained from the "schedulers." The medical records provided by Defendants do not appear to include the time period to which Dr. Getachew attests.

Fly states in his response that he "never refused a[n] appointment. I never signed a refusal form." ECF No. 30 at 3. Fly further states that "[N]icole [B]rooks" [from UMMS] was told that his cellmate had COVID-19 and that was why he was not being brought to UMMS for an infusion. *Id.* He denies that he has ever refused treatment. *Id.* Fly also states in his response that his ostomy bag leaked because the wafer, which is connected to the bag, would wear out, did not stick well, and the leakages had nothing to do with hiding weapons. *Id.* at 3-5.

Defendants' Reply reasserts their legal arguments. ECF No. 33.

## Legal Standards

### A. Federal Rules of Civil Procedure 12(b)(6) and 56(a)

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true

(even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). The court may "consider documents attached to the complaint, *see* Fed.R.Civ.P. 10(c), as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic[.]" *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007) (citation omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted).

Rule 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247-48 (emphasis in original).

The Court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (per curiam) (citation and quotation omitted), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. NC. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015). At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).

Defendant Dr. Getachew's Motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56(a). A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Conversion of a motion to dismiss to one for summary judgment under Rule 12(d) is permissible where a plaintiff has "actual notice" that the motion may be disposed of as one for summary judgment. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260-61 (4th Cir. 1998). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for a court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; a court "does not have an obligation to notify parties of the obvious." *Laughlin*, 149 F.3d at 261. Because Dr. Getachew filed his motion as a motion to dismiss, or in the alternative, for summary judgment, Fly was on notice that the Court could treat the motion as one for summary judgment and rule on that basis.

      B.      **Eighth Amendment**

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *accord Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017).

To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson*, 877 F.3d at 543. Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. *See Farmer v. Brennan*, 511 U.S. 825, 834-7 (1994); *see also Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017); *King,* 825 F.3d at 218; *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Heyer*, 849 F.3d at 210 (quoting *Iko*, 535 F.3d at 241); *see also Scinto*, 841 F.3d at 228 (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need). Proof of an objectively serious medical condition, however, does not end the inquiry.

After a serious medical need is established, a successful claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious medical condition. *See Farmer*, 511 U.S. at 839-40. "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). The subjective

knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842). It is established that delay of treatment in the face of significant pain is the kind of harm sufficient to support a finding of deliberate indifference. *Sharpe v. S.C. Dep't of Corr.*, 621 F. App'x 732, 733–34 (Mem) (4th Cir. 2015); *see Formica v. Aylor*, 739 F. App'x 745, 755 (4th Cir. 2018) (collecting cases).

## Discussion

Dr. Getachew asserts that he is entitled to a dismissal of claims or summary judgment because there is no evidence that Fly received inadequate care, and further that Fly's state law claims of medical malpractice and negligence fail because he has not complied with the Maryland Health Care Malpractice Claims Act, Md. Code (2020 Repl. Vol), § 3-2A-01 *et seq.* of the Courts and Judicial Proceedings Article. ECF No. 26-1. Dr. Getachew has submitted materials outside the pleadings and the Court will construe his Motion in part as one for summary judgment.

### A.   Medical Negligence Claim

Dr. Getachew asserts in his Memorandum that to the extent that Fly intended to raise a state law medical malpractice or negligence claim based on this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a), the claim is subject to dismissal because Fly failed to comply with Maryland Health Care Malpractice Claims Act, Md. Code (2020 Repl. Vol), § 3-2A-01 *et seq.* of the Courts and Judicial Proceedings Article. ECF No. 26-1 at 10. Dr. Getachew fails to provide a declaration or other evidence to support the allegation. Nevertheless, the only reference Fly appears to make to a medical "negligence" claim is in his Response where he states "…in my exhibit I proved neglegance [sic] & also my 8th amendment was violated." ECF No. 30 at 1.

11

Based on the record before the Court, the Court does not find that Fly asserts a state law claim of medical malpractice or negligence. Dr. Getachew's motion to dismiss any such claim is denied as moot at this juncture.

### B. Eighth Amendment Claim

It is undisputed that Fly is diagnosed with Crohn's disease and suffers from a serious medical need. The parties focus instead on whether the record could support a finding of deliberate indifference by Dr. Getachew in response to his need.

Dr. Getachew asserts that Fly has been provided with "appropriate" medical treatment since his arrival at WCI on October 14, 2019, and has "access to" medical treatment for ongoing complaints. ECF No. 26-3 at 3, 6. Dr. Getachew also asserts that a "disagreement" with treatment cannot support a claim of deliberate indifference, and Fly does not indicate that any alleged delay in treatment caused him harm. ECF No. 26-1 at 15.

As noted, the medical records provided are incomplete, contain blank pages, are duplicative, are not current to the date of Dr. Getachew's declaration, and are difficult to put into chronological perspective. Nevertheless, the records indicate that Fly's serious medical condition and treatment needs were made known to Dr. Getachew dating back to at least December 8, 2019, when he is noted to be the provider on Fly's sick call request for needed supplies related to his ileostomy. ECF No. 8-2 at 10. Again on September 2, 2020, Dr. Getachew is noted to have completed what appears to be "consultation" request. ECF No. 26-2 at 239. The document itself is incomplete, followed by numerous blank pages. *Id.* at 239-246. A later report also is incomplete but lists Dr. Getachew as the "Provider" as of October 30, 2020. *Id.* at 249-254.

Numerous additional medical records list Dr. Getachew as the provider. *See, e.g.*, ECF No. 8-2 at 12 (March 10, 2020, assessment plan to schedule Fly for chronic care clinic); *id.* at 14

(March 16, 2020, request for supplies); *id.* at 56 (September 2, 2020, consultation request for colonoscopy); *id.* at 59 (September 8, 2020, colonoscopy did not happen as not authorized); ECF No. 26-2 at 257 (November 17, 2020, leaking appliance and request for supplies); *id.* at 289 (May 8, 2021, incomplete record); *id.* at 311 (July 18, 2021, incomplete record); *id.* at 332 (August 22, 2021, incomplete record); *id.* at 340 (September 2, 2021, incomplete record); *id.* at 342 (September 13, 2021, incomplete record); and *id.* at 355 (November 6, 2021, incomplete record). In addition, medication records dating back to November 14, 2019, list Dr. Getachew as the prescriber. *Id.* at 402-410. Further, Dr. Getachew attests that he is familiar with Fly's care, and concludes that he has received "appropriate" treatment for his Crohn's disease since arriving at WCI on October 14, 2019. ECF No. 26-3 at 3.

The medical records are clear that Fly arrived at WCI in October 2019, having consistently received Entyvio infusions for the prior three years, and providing written medical documentation to that effect. Further, a consulting gastroenterologist continually made requests that Fly be resumed on Entyvio. While at WCI, medical records repeatedly document Fly's need for medication and treatment during the remaining months of 2019, all of 2020, all of 2021, and into 2022.

The parties do not dispute that Fly's very first treatment was scheduled for November 9, 2021, which was over two years after his arrival at the facility.[2] This is not, as Defendants assert,

---

[2] Dr. Getachew's declaration that addresses Fly's failure to attend scheduled appointments is not based on either his personal knowledge or a verified medical record. ECF 26-3 at 5-6. Similarly, Fly's response on these points is not verified. ECF No. 30. Because Fly's Amended Complaint (ECF No. 5-3) and Reply (ECF No. 30) are both unverified, the factual assertions may not be considered in opposition to Defendants' motion. *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991); Fed. R. Civ. P. 56(c)(1)(A). The Court finds there is a dispute of fact as to whether Dr. Getachew was deliberately indifferent to Fly's serious medical needs, based on the excessive delay in providing needed treatment which exceeded two years, without consideration of the reasons for missing scheduled treatments beginning in November 2021.

a difference in opinion on treatment. There is nothing in the record indicating that Dr. Getachew opined that Fly did not need the medication that was repeatedly recommended by the consulting gastroenterologist. In fact there was a delay of over two years in providing needed treatment for a serious medical condition documented to cause pain and suffering for Fly.

The Motion will be denied as to Dr. Getachew. At this stage, Fly has alleged, and a genuine dispute of fact exists, as to whether Dr. Getachew was deliberately indifferent to Fly's serious medical needs in violation of his Eighth Amendment rights. Summary judgment absent discovery is also denied as to Dr. Getachew.

## Conclusion

For the foregoing reasons Defendant Getachew's Motion is denied. Pro bono counsel will be appointed to represent Fly.

A separate Order follows.

March 2, 2023                          /s/
Date                                        Stephanie A. Gallagher
                                               United States District Judge